# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION

**CIVIL ACTION NO. 3:16-CV-00125-JHM**

**TOM HARPER, SANDRA KRUMMA,**
**PEGGY SUE LEAKE, SAMUEL ZANE LEAKE,**
**JON SOUDER, CONCO ACQUIREMENT LLC,**
**and DELFASCO LLC**                                                      **APPELLANTS**

**V.**

**CONCO ESOP TRUSTEES,**
**OVERSIGHT COMMITTEE,**
**THE ARMY, and CONCO, INC.**                                            **APPELLEES**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on appeal from a February 18, 2016 Memorandum-Opinion and Order of the United States Bankruptcy Court for the Western District of Kentucky (the "February 18, 2016 decision") [Bankr. DN 552] in the Chapter 11 bankruptcy case <u>In re Conco, Inc.</u>, No. 12-34933-jal (Bankr. W.D. Ky.).[1]   In that opinion and order, the Bankruptcy Court interpreted Appellee-Debtor Conco Inc.'s Confirmed Plan[2] to prohibit the sale of the ESOP-held Conco stock (the "Equity Security Interests" in the Debtor)[3] from being sold or transferred until January 1, 2019 and enjoined any such sale until that time.   Fully briefed, this matter is ripe for decision.   For the following reasons, the Court **AFFIRMS** the decision of the Bankruptcy Court.

---

[1] All record citations to this Court's docket in the instant appeal have the prefix "App. DN," references to the Bankruptcy Court docket have the prefix "Bankr. DN," and references to this Court's docket in <u>Harper et al. v. Everson et al.</u>, No. 3:15-CV-00575-JHM (the "ERISA Litigation"), have the prefix "ESOP DN."

[2] "Confirmed Plan," for purposes of this opinion, refers collectively to Debtor-Conco's Third Amended Plan of Reorganization [Bankr. DN 417] and the Order confirming Debtor-Conco's Third Amended Plan of Reorganization [Bankr. DN 468].

[3] For purposes of this opinion, "Conco stock," "equity security interests," and "Equity Interests" are interchangeable.

# I. BACKGROUND

Although the history of this case is set out in detail in the February 18, 2016 decision, and this Court's May 13, 2016 Order [App. DN 38], the Court finds it helpful to restate the relevant facts in one opinion.  Conco, Inc. ("Conco" or the "Debtor") manufactures ammunition containers for the U.S. Armed Forces and contractors who provide ammunition to the U.S. Armed Forces.  (See [Bankr. DN 389] 5.)  All of the stock of Debtor-Conco is held by the Conco, Inc. Employee Stock Ownership Plan and Trust (the "ESOP"), a defined contribution employee benefit plan.  (See id.; see also Confirmed Plan [Bankr. DN 468-1] § 3.05.) Appellant-Participants are all former employees of the Debtor who are participants in the ESOP. ([ESOP DN 1].)

On November 5, 2012, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  During the course of the Chapter 11 proceedings, Conco's main competitor, Delfasco, attempted to acquire Debtor-Conco and gain control of Debtor-Conco's estate.[4]  (See [Bankr. DN 389] 16; see also [Bankr. DN 300] 1–2.)  These attempts proved to be unsuccessful.

On September 3, 2013, the Debtor filed its initial plan of reorganization [Bankr. DN 184], which provided that the holders of the Debtor's stock (referred to in the plan as the "equity securities in the Debtor" and classified as Class 4 interests) would retain those interests, the Debtor's business would not be sold, and general unsecured creditors (Class 3 creditors) would receive approximately 16 cents on the dollar for their claims.  (See [Bankr. DN 512].)  The Creditors Committee, among others, objected to this plan.  The Debtor proposed several more plans, (see [Bankr. DN 256, 340, 417]), each increasing the amount the Class 3 creditors would receive and all containing the same language regarding the Class 4 interests retaining their

---

[4] Delfasco formed Conco Acquirement LLC in order to pursue the potential purchase of Conco's assets.  (See [Bankr. DN 300] 3.)  The Court will refer to Appellants Conco Acquirement LLC and Delfasco LLC as, collectively, the "Delfasco Appellants."

interest and providing that the Debtor's business would not be sold.   The Unsecured Creditors Committee ("UCC") and Delfasco LLC worked together to propose an alternative plan of reorganization that would result in the sale of the Debtor's assets and which would result in a higher recovery for the Class 3 creditors.   The same day the Debtor filed its Second Amended Plan of Reorganization [Bankr. DN 340], the UCC filed its competing plan [Bankr. DN 342], which would have extinguished the Class 4 Equity Interests in the Debtor and which proposed, as an alternative mechanism of reorganization, an auction of substantially all of the Debtor's assets, and proposed to pay creditors from either the proceeds of the auction or from what was being offered in the Debtor's plan, depending on which mechanism yielded the highest and best return for the Debtor's estate.   The Debtor and the Debtor's main customers, General Dynamics and the United States Department of the Army, opposed Delfasco's efforts to acquire control of the Debtor, with both customers declaring they would terminate their contracts with the Debtor in the event Delfasco was successful.   (See Mem.-Op. [Bankr. DN 552] 2.)   "Without these contracts, Debtor would be forced to terminate its business operations.   After extensive arm's length negotiations with Debtor, General Dynamics, the UCC and Delfasco, the UCC determined it was in the best interest of the creditor body to reject Delfasco's efforts to purchase control of the Debtor."   (Id.)   On October 20, 2014, the Debtor filed the Third Amended Plan of Reorganization (the "Plan" or "Amended Plan") [Bankr. DN 417].   The parties' negotiations resulted in the UCC supporting the Debtor's plan of reorganization and withdrawing its competing plan, in exchange for the Debtor agreeing to make both Defined Distributions and Contingent Distributions, which would be funded by the operation of the Debtor's business, which was to continue through December 31, 2018.   The UCC supported the Amended Plan

"because [it] guaranteed unsecured creditors a higher guaranteed recovery than if Delfasco gained control of the Debtor."   (Mem.-Op. [Bankr. DN 552] 2.)

By Order dated November 20, 2014 [Bankr. DN 468], the Bankruptcy Court confirmed Debtor-Conco's Third Amended Plan of Reorganization, overruling all remaining objections of Delfasco.   The Confirmed Plan provides Class 3 "(i) Defined Distributions - general unsecured claim holders approximately $4,848,391, which equates to approximately 40 cents on the dollar for their claims; and (ii) Contingent Distributions representing each holder's pro rata share of 50% of Debtor's 'annual net operating profit before depreciation' over the amount projected by Debtor in the forecast years 2015 to 2018."   (Mem.-Op. [Bankr. DN 552] 3.)   Regarding the equity securities in the Debtor (the Conco stock), the Confirmed Plan provides that:

> On the Effective Date, holders of equity securities in the Debtor shall retain their interests as in existence immediately prior to the Effective Date.   Between Confirmation and the Effective Date, the ESOP shall be amended to provide that the Debtor may not contribute money or any other property to the ESOP, nor repurchase any employee-owned equity securities through December 31, 2018, to the extent allowed by applicable law.

(Confirmed Plan, Art. V–Treatment of Claims and Interests, Class 4 – Equity Security Interests [Bankr. DN 468-1] 9.)   December 31, 2018, is when the last Defined Distributions are scheduled to be made and the last Contingent Distributions would be calculated.   (See Mem.-Op. [Bankr. DN 552] 3.)

After the Plan was confirmed, Delfasco renewed its efforts to acquire Conco and, in April and June 2015, made offers to the ESOP Trustees and the Conco board of directors to purchase all of the Conco stock held by the ESOP.   These offers were not accepted.

On July 1, 2015, Appellant-Participants filed a Complaint against Conco (sponsor and Plan Administrator of the ESOP), the Board of Directors of Conco, Inc. (entity through which Conco performs the functions of Plan Administrator of the ESOP), the ESOP, and the Conco

ESOP Trustees[5] (the ERISA litigation, Case No. 3:15-CV-00575-JHM).   Appellant-Participants assert two claims, one for a declaration that the Conco ESOP Trustees have breached their fiduciary duties under ERISA by not evaluating and responding to offers by Delfasco Appellants to purchase the Conco stock and one for injunctive relief removing the ESOP Trustees and naming one or more independent trustees.   (See Compl. [ESOP DN 1]; see also Am. Compl. [ESOP DN 114] (adding, inter alia, allegation that ESOP Trustees failed to act prudently by appointing an independent fiduciary to evaluate offers).)

Following a preliminary injunction hearing on July 16, 2015, the ESOP Trustees and Debtor-Conco filed motions to transfer and to refer the ERISA litigation to the Bankruptcy Court [ESOP DN 28, 20].   The issue of whether Conco's Confirmed Plan prohibits the sale of the Conco stock, to anyone, before December 31, 2018, was raised, and on October 19, 2015, the Court heard oral argument on the motions.   Debtor-Conco contended that a sale to Delfasco would violate the terms of the Confirmed Plan, noting that looking at Delfasco acquiring the Debtor "would be different than looking at a separate entity in acquiring this, because there would be no . . . intent from any other company to close Conco down.   If I had a company and I was going to try to acquire this and I was not in that business, it makes no sense for me to acquire it and then shut it down, but here it makes perfect sense."   (Hr'g Tr., Oct. 19, 2015 [ESOP DN 45] 11:18–12:7.)   When asked by the Court whether Conco's "position would be that it would not be a violation of the plan for the ESOP to sell this company to General Electric?" Conco's counsel responded that "it would depend upon the proposal that was made by General Electric.   We would have to look at the proposal that General Electric made to determine whether that would be a violation of the plan or not.   It's kind of hard to stand here

---

[5] Gilbert Everson (President of Conco), Robert Corcoran (Vice President and a Director), Carol Tarter (Contract Administrative Specialist and a Director), and Karen Paschal (Accounting Manager and a Director) (collectively, the "Conco ESOP Trustees" or "ESOP Trustees").

and speculate right now whether another party would or would not violate the Chapter 11 confirmation order." (Id. at 14:7–:15.) Ultimately, according to Conco, whenever any entity "comes courting and has an offer to be made, the Bankruptcy Court needs to be involved because of how it might conceivably affect the plan." (Id. at 16:4–:12.) Conco concluded that the Chapter 11 plan needed to be interpreted in the context of the Delfasco proposal and the Bankruptcy Court was best suited to do that. (Id. at 16:14–:17.) The ESOP Trustees essentially contended that a sale of the ESOP-owned stock would violate the terms of the Confirmed Plan, no matter the identity of the acquiring entity. (See id. at 27:18–29:5; see also Mot. to Transfer [ESOP DN 28] 1–2; Mem. Supp. Mot. to Transfer [ESOP DN 28-1] 3, 9–11, 14; Reply in Supp. Mot to Transfer [ESOP DN 40] 5 n.1 ("When considered as a whole, the Plan plainly prohibits any voluntary transaction that would cause Conco to cease or result in Conco (or its equity shareholders) voluntarily ceasing to operate its business in exchange for money prior to Conco's creditors being repaid in 2018.").) The Appellant-Participants contended that there is no provision in the Confirmed Plan that restricts the ESOP Trustees' ability to sell the Conco shares owned by the ESOP. This Court denied the motions to refer by order, finding that it could answer Count I in the Complaint without interpreting the terms of the Confirmed Plan. (Order of Oct. 22, 2015 [ESOP DN 44] 5–7.)[6]

Thereafter, the Oversight Committee had the bankruptcy case reopened and on November 6, 2015, the Oversight Committee filed in the Bankruptcy Court a motion to enforce the Confirmed Plan by prohibiting the sale of the Class 4 Equity Security Interests until January 1,

---

[6] The Court found that "[t]he lingering question—can the ESOP-owned stock be sold without violating the Bankruptcy Plan—is a question that will ultimately have to be answered prior to the consummation of a sale; however, it is not a question that the Court will need to decide in this case." (Order of Oct. 22, 2015 [ESOP DN 44] 5–6.) The Court found that the answer to that question, while a factor the Court would consider in analyzing whether the ESOP Trustees breached their fiduciary duties, "[would] not be determinative of the issues in this suit." (Id. at 6.)

2019 [Bankr. DN 512] (the "Motion to Enforce").[7]   On November 18, 2015, the ESOP Trustees filed in the Bankruptcy Court a motion seeking clarification of the Confirmed Plan and a declaration of rights therein [Bankr. DN 516] (the "Motion for Clarification").   Specifically, the ESOP Trustees sought "necessary guidance and a declaration from the Bankruptcy Court as to whether a sale of 100% of shares of ESOP-owned stock to Delfasco, or any third party, prior to completion of the Amended Plan in 2018, is consistent with and/or violates the Confirmation Order and Amended Plan."   (Def. ESOP-Trustees' Mot. for Clarification [Bankr. DN 516] 4.) On December 3, 2015, Delfasco Appellants filed an objection to the motions to enforce and for clarification [Bankr. DN 525], Debtor-Conco filed a response in support of the Motion to Enforce [Bankr. DN 526], and Appellant-Participants filed an objection and supplemental objection to the motions to enforce and for clarification [Bankr. DN 527, 528].

Section 1141 of the Bankruptcy Code provides that a plan and the order confirming the plan bind the debtor and the debtor's creditors.   11 U.S.C. § 1141(a).   Section 1142(b) of the Bankruptcy Code authorizes bankruptcy courts to enforce § 1141 by providing that "[t]he court may direct the debtor and any other necessary party . . . to perform any other act . . . that is necessary for the consummation of the plan."   11 U.S.C. § 1142(b).   Bankruptcy Rule 3020(d) provides that "[n]otwithstanding the entry of the order of confirmation, the court may issue any other order necessary to administer the estate."   Fed. R. Bankr. P. 3020(d).

As the Bankruptcy Court recognized, the Amended Plan at Article X §§ b, m, and o, set forth that court's jurisdiction to enforce the terms of the Amended Plan and the Confirmation Order.   (See Confirmed Plan [Bankr. DN 468-1] Art. X § b ("to enforce performance of the Plan against the Debtor, all claimants or any other entity"), § m ("to hear and determine all

---

[7] The Oversight Committee is the successor in interest to the Unsecured Creditors Committee, which was a statutorily appointed committee under Chapter 11 of the Bankruptcy Code.  (See Oversight Committee's Brief [App. DN 41] 2; see also Confirmed Plan [Bankr. DN 468-1] § 2.01(p).)

controversies, suits and disputes that may arise in connection with the interpretation or enforcement of the Plan, including but not limited to disputes relating to the Defined Distributions, Contingent Distributions, the Forecast and Allowed Forecast Variance"), § o ("to hear and determine such matters and make such orders consistent with the Plan as may be necessary or desirable to carry out the provisions thereof").)[8]

On November 21, 2015, in the ERISA litigation, Appellant-Participants filed a motion to withdraw the reference from the Bankruptcy Court regarding the Motion to Enforce and Motion for Clarification [ESOP DN 50].   The Court denied the motion by order on December 7, 2015 [ESOP DN 54].

Delfasco made another offer to purchase the Conco stock in December 2015, which is currently set to expire July 31, 2016.

On December 10, 2015, the Bankruptcy Court held a hearing on the motions to enforce and for clarification.   (See Hr'g Tr., Dec. 10, 2015 [Bankr. DN 538].)   On February 18, 2016, the Bankruptcy Court granted the Motion to Enforce [Bankr. DN 512] and the Motion for Clarification [Bankr. DN 516], and further ordered "that the holders of Class 4 Equity Security Interests of Conco, Inc. under the Debtor's Third Amended Plan of Reorganization are hereby enjoined from selling, transferring, or otherwise divesting themselves of the Equity Interests of Conco, Inc. until January 1, 2019."   (Order [Bankr. DN 552].)   The court found that the four corners of the Amended Plan, as well as the UCC's abandonment of its objection under the absolute priority rule of 11 U.S.C. § 1129(b) to the ESOP's retention of the Equity Interests in the Debtor, evidenced an intent for the Equity Interests not to be sold until December 31, 2018.

---

[8] The Bankruptcy Court also recognized that the source of its subject-matter jurisdiction is 28 U.S.C. § 1334, not the retention of jurisdiction provisions in a confirmed plan, and found that it had subject matter jurisdiction under § 1334.   (See Mem.-Op. [Bankr. DN 552] 5–7.)

Appellants filed a timely notice of appeal of the Bankruptcy Court's opinion and order on February 26, 2016, pursuant to 28 U.S.C. § 158(a).   ([App. DN 1].)   Appellants contend that the Bankruptcy Court erred as a matter of law because (1) the Plan's plain language does not preclude a sale, (2) the Plan's related disclosure statement does not communicate any prohibition on a sale, and (3) the absolute priority rule, which was invoked by the Bankruptcy Court, has no relevance to the issue of whether the Plan as confirmed places any limit on the right of the ESOP to sell its Conco stock.   Accordingly, Appellants contend that the February 18, 2016 decision should be reversed.

## II.  STANDARD OF REVIEW

A federal district court has jurisdiction to hear appeals from "final judgments, orders, and decrees" of the bankruptcy court.   28 U.S.C. § 158(a)(1).   On appeal, a district court reviews the bankruptcy court's findings of fact under a clearly erroneous standard and reviews the bankruptcy's courts conclusions of law de novo.   In re Crowell, 305 F.3d 474, 476 (6th Cir. 2002); Nicholson v. Isaacman (In re Isaacman), 26 F.3d 629, 631 (6th Cir. 1994).   The parties differ on the standard of review to be applied in this case.

"The standard of review on appeal is determined by the nature of the action taken below by the bankruptcy court."   In re Terex Corp., 984 F.2d 170, 172 (6th Cir. 1993).   That is, the standard of review which this Court applies to the Bankruptcy Court's decision "depends on whether that decision resulted in a modification of the amended plan, and thus was made in reliance upon or was based on an interpretation of the Bankruptcy Code, or rather simply involved the bankruptcy court's interpretation of that plan."   In re Dow Corning Corp., 456 F.3d 668, 674–75 (6th Cir. 2006) (citing In re Terex, 984 F.2d at 172).   A bankruptcy court's interpretation of a chapter 11 plan is reviewed for abuse of discretion.   Id.; In re Terex, 984 F.2d at 172.   However, "bankruptcy court decisions that rely on or interpret the Bankruptcy Code are

subject to de novo review."   In re Dow Corning, 456 F.3d at 675 (citing In re Terex, 984 F.2d at 172).

In In re Terex, the debtor-appellant argued that "because the bankruptcy court relied on specific provisions of the Bankruptcy Code in arriving at its decision, the standard of review should be de novo"; in contrast, the appellee argued "that the bankruptcy court exercised its equitable powers in resolving the interest issue and that an abuse of discretion standard should therefore apply."   984 F.2d at 172.   The Sixth Circuit "conclude[d] that although the bankruptcy court referred to explicit provisions of the Bankruptcy Code, it did not rely on or interpret the Bankruptcy Code. Its ruling, therefore, cannot be said to constitute a legal conclusion subject to de novo review.   Rather, we believe that the bankruptcy court interpreted the Plan, and then exercised its equitable powers to breath[e] life into the provisions of the Plan. Accordingly, we review the interpretation of the Plan with full deference and we review the bankruptcy court's exercise of its equitable powers under an abuse of discretion standard."   984 F.2d at 172 (citations omitted).

Following In re Terex, Appellees argue that the Bankruptcy Court's decision should be reviewed for abuse of discretion, because the decision was an interpretation of the Plan's language in exercise of that court's equitable powers to interpret and enforce a confirmed plan. Appellants argue that the Bankruptcy Court's decision should be reviewed de novo, because they argue that the February 18, 2016 decision effectively modified the Plan by inserting a material provision prohibiting the sale of Conco stock held by the ESOP and did so based on an interpretation of 11 U.S.C. § 1129(b) (the "absolute priority rule").   Alternatively, they argue that because, in interpreting the plan, the Bankruptcy Court did not exercise its equitable powers, the abuse-of-discretion standard applied in In re Terex should not govern.   Rather, they argue,

the Bankruptcy Court's ruling constitutes purely legal contractual analysis, and thus should be reviewed de novo.

Thus, if the Bankruptcy Court's February 18, 2016 decision is an interpretation of the Plan, it is entitled to substantial deference by this Court, and it will be reviewed for an abuse of discretion.   In order to determine whether the Bankruptcy Court's decision "merely interpreted the plan, as opposed to modifying it, 'we turn to the reasoning and language in the bankruptcy court's [February 18, 2016] order.'"   In re Dow Corning, 456 F.3d at 675 (quoting In re Terex, 984 F.2d at 172).   The language of the Bankruptcy Court's decision makes clear that it was only interpreting the Confirmed Plan, not modifying it.   In the Bankruptcy Court's view, "[t]he Amended Plan . . . provides that the ESOP would hold all of the equity security interest in the Debtor until December 31, 2018, when the last Defined Distributions are scheduled to be made and the last Contingent Distributions would have been calculated."   (Mem.-Op. [Bankr. DN 552] 3.)   The Bankruptcy Court, noting that the primary objective when interpreting a contract is to effectuate the parties' intent, found that, here, the parties intent—"for the equity interests to remain as they stood at confirmation until the Amended Plan is completed"—"is evident in the Amended Plan."   (Id. at 8.)   Finding that "Delfasco's interpretation of Article V misses the essential bargain struck by the parties to the Amended Plan," the court explained that the "four corners of the document evidence the parties intent and agreement for the ESOP holders and the Equity Interest holders to maintain their stock position until completion of the Amended Plan." (Id. at 7.)

Further, the Bankruptcy Court's reasoning makes clear that it was interpreting the Confirmed Plan and then exercising its equitable powers to breathe life into the provisions of the Plan.   Noting that "[a]s Delfasco is Debtor's direct competitor, the purchase of the Equity

Interests gives it opportunity and incentive to impair the Debtor's reorganization," the Bankruptcy Court remarked that "[i]f Delfasco is allowed to defeat the Amended Plan . . . Delfasco will benefit to the detriment of the creditors and the Debtor, who will lose the benefit of the bargain that the parties fought so hard to achieve."   (Id. at 10.)   The ESOP, i.e., the holder of the Equity Interests—interests that would have been worth nothing if Debtor-Conco had not emerged from the bankruptcy proceedings as a going concern—was permitted to retain those interests without putting any new investment into the reorganized Debtor.   The Class 3 creditors, who had at one time proposed an alternate plan contemplating the sale of the Debtor's assets, could have exercised their right to object under the absolute priority rule and prevented the ESOP from retaining its interests.   However, due to the parties' negotiations and the bargained-for defined and contingent distributions the Debtor would make to the Class 3 creditors, the Class 3 creditors did not object and Debtor-Conco emerged as a going concern. The Bankruptcy Court essentially stated that it would be inequitable for the ESOP to now sell its Equity Interests to a competitor, causing the Debtor to cease operating as a going concern and impairing, if not eliminating, the Class 3 creditor's receipt of the defined and contingent distributions.   Pointing out the various "bargained for exchanges the parties made in reliance upon faithful performance under the Amended Plan," including the UCC's giving up its right to object under the absolute priority rule, 11 U.S.C. § 1129(b), the Bankruptcy Court found that it "must enter the relief requested . . . in order to protect the rights of all parties which were bargained for in the Amended Plan."   (Id. at 10–11.)   Based on these equitable considerations, the Bankruptcy Court enjoined the ESOP from selling or transferring the Equity Interests until January 1, 2019.

Like in In re Terex, the Court concludes that although the Bankruptcy Court referred to an explicit provision of the Bankruptcy Code, its decision was not a modification of the Plan made in reliance upon or based on an interpretation of the Bankruptcy Code.   Given that the Bankruptcy Court's February 18, 2016 decision merely interpreted, rather than modified, and breathed life into the provisions of the Confirmed Plan, the Court reviews the decision for abuse of discretion, affording substantial deference to the Bankruptcy Court.   See In re Dow Corning, 456 F.3d at 676; see also In re Settlement Facility Dow Corning Trust, 628 F.3d 769, 772 (6th Cir. 2010) (where district court, not bankruptcy court, was court interpreting language of bankruptcy plan, Sixth Circuit found as rationale for deference that the district judge had presided over the case for fifteen years and adjudicated the case directly for nine years, thus, "[t]here is simply no denying that she is much more familiar with this Plan—and with the parties' expectations regarding it—than we are").

### III. DISCUSSION

Appellants first argue that the Bankruptcy Court's prohibition on the sale of the ESOP-held Equity Interests is contrary to the plain language of the Plan, which, Appellants argue, permits the ESOP to sell its Equity Interests in Conco.   As noted by the Bankruptcy Court, the Confirmed Plan includes the following provisions: (i) providing for defined and contingent distributions to be made to Class 3 creditors; (ii) providing for the treatment of Class 4 equity security interest holders; and (iii) providing, as the means to implement the Plan, that the Debtor shall retain its assets and continue to use them in operating as a going concern.   In its decision, the Bankruptcy Court found that Appellants' interpretation of Article V "misses the essential bargain struck by the parties to the Amended Plan,"—which was that "the Debtor, the ESOP, and the Interested Parties would keep control and their ownership interests with NO distributions and

NO transfers of ownership in return for the UCC's support of the Amended Plan terms"—and held that the four corners of the Confirmed Plan evidenced "the parties intent and agreement for the ESOP holders and the Equity Interest holders to maintain their stock position until completion of the Amended Plan."   (Mem.-Op. [Bankr. DN 552] 7–8.)

Appellants argue that the plain and unambiguous terms of the Confirmed Plan prohibit only Debtor-Conco from purchasing the Equity Interests, but provide no restriction on the right of the ESOP to sell its Equity Interests in the Debtor to a third party and cannot be read to prohibit such a sale.   (See Appellants' Br. [App. DN 35] 18–33; id. at 32 ("the two sentences [regarding the treatment of the Class 4 interests] read alone unambiguously permit a sale of the ESOP-held stock to a third party").)   Appellants contend that the Bankruptcy Court, though referring to the four corners of the Plan, impermissibly relied on extrinsic information to interpret the language of the Plan, "effectively rewrit[ing] the Plan to provide a restriction not to be found within the four corners of the Plan document."   (Id. at 32–33.)   Further, Appellants contend that the absence from the Disclosure Statement—which must provide "adequate information" concerning the affairs of the debtor to enable the holder of a claim or interest to make an informed judgment about the plan prior to voting, see 11 U.S.C. § 1125—of any such restriction demonstrates that no such restriction exists.   Accordingly, Appellants contend that the Bankruptcy Court erred by "reading [such] a restriction into the unambiguous text."   ([App. DN 35] 17.)

Whether the ESOP-held Equity Interests may be sold prior to January 1, 2019 is governed by the Confirmed Plan.   When the Bankruptcy Court confirmed the Debtor's Chapter 11 plan, the plan became binding on the parties, including the Debtor, the UCC/Oversight

Committee, Delfasco Appellants, and the ESOP.   11 U.S.C. § 1141(a)[9]; In re Monclova Care Ctr., Inc., 59 F. App'x 660, 663 (6th Cir. 2003).   "In interpreting a confirmed plan, courts use contract principles, since the plan is effectively a new contract between the debtor and its creditors." In re Dow Corning, 456 F.3d at 676; 11 U.S.C. § 1141(a).   "State law governs those interpretations," In re Dow Corning, 456 F.3d at 676, and, under Kentucky law, the primary objective in construing a contract is to effectuate the intent of the parties, 3D Enters. Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Dist., 174 S.W.3d 440, 448 (Ky. 2005) (citing Cantrell Supply, Inc. v. Liberty Mut. Ins. Co., 94 S.W.3d 381, 384 (Ky. Ct. App. 2002)).   "Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it if possible." Cantrell Supply, 94 S.W.3d at 384–85 (quoting City of Louisa v. Newland, 705 S.W.2d 916, 919 (Ky. 1986)).

Absent an ambiguity in the contract, the parties' intentions must be discerned from the four corners of the instrument without resort to extrinsic evidence. Hoheimer v. Hoheimer, 30 S.W.3d 176, 178 (Ky. 2000).   "Where a contract is ambiguous or silent on a vital matter, a court may consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties." Cantrell Supply, 94 S.W.3d at 385; see Ranier v. Mount Sterling Nat'l Bank, 812 S.W.2d 154, 156 (Ky. 1991) (quoting Caudill v. City of Maysville, 178 S.W.2d 945, 946 (Ky. 1944)) ("When a contract is silent with respect to a matter vital to the rights of the parties, a court, in construing it, is necessarily compelled to resort to a consideration of the surrounding circumstances and the conduct of the participants indicating their interpretations."); Bank of New

---

[9] Section 1141(a) provides in pertinent part: "[T]he provisions of a confirmed plan bind the debtor . . . and any creditor [or] equity security holder . . . whether or not the claim or interest of such creditor [or] equity security holder . . . is impaired under the plan and whether or not such creditor [or] equity security holder . . . has accepted the plan." 11 U.S.C. § 1141(a).

York v. Janowick, 470 F.3d 264, 270–71 (6th Cir. 2006) (same).   "A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." Cantrell Supply, 94 S.W.3d at 385.   "The fact that one party may have intended different results, however, is insufficient to construe a contract at variance with its plain and unambiguous terms."   Id.   "Although the interpretation of an amended plan of reorganization is analogous in many respects to the construction of a contract, we remain mindful that the law of this circuit requires that we review a bankruptcy court's interpretation of its own decisions with significant deference."   In re Dow Corning, 456 F.3d at 676 (citing In re Terex, 984 F.2d at 172).

Here, the Confirmed Plan required that the Debtor make Defined and Contingent Distributions to the Class 3 creditors and that the ESOP, as the holder of the equity securities in the Debtor (Class 4), "retain [its] interest as in existence immediately prior to the Effective Date."   It further provided, regarding Class 4, that "[b]etween Confirmation and the Effective Date, the ESOP shall be amended to provide that the Debtor may not contribute money or any other property to the ESOP, nor repurchase any employee-owned equity securities through December 31, 2018, to the extent allowed by applicable law."   Article VIII, regarding the means for implementation of the Plan, see 11 U.S.C. § 1123(a)(5), states that "[u]pon the effective date, the Debtor will retain all property of its estate and continue to use it in the operation of its manufacturing business," see id. § 1123(a)(5)(A).   (Confirmed Plan [Bankr. DN 468-1] § 8.01.)   In its February 18, 2016 decision, the Bankruptcy Court did not state whether it found the Confirmed Plan to be ambiguous with respect to the question of whether the ESOP-held Equity Interests may be sold or otherwise transferred prior to January 1, 2019.   The only reference to ambiguity is when the Bankruptcy Court stated "[w]hen no ambiguity exists, the Court need only look as far as the four corners of the document to determine the parties' intent."

(Mem.-Op. [Bankr. DN 552] 8 (citing Hoheimer, 30 S.W.3d at 178).)   The Bankruptcy Court

went on to state that the parties' intent was evident from the four corners of the Amended Plan

and that the "intent was for the equity interests to remain as they stood at confirmation until the

Amended Plan is completed."   (Id.)   However, the Bankruptcy Court went on to note that the

parties' intent was also evidenced by the UCC's abandonment of its objection per the absolute

priority rule to the ESOP's retention of stock and also to discuss the circumstances surrounding

the Confirmed Plan, the subject matter of the contract, the objects to be accomplished, and the

conduct of the parties—factors generally considered to discern the intent of the parties when a

contract is ambiguous or silent.   (See id. at 7–8 ("Retention of the stock was a concession to

stockholders by the UCC on behalf of its class in return for no distributions or transfers of that

stock until December 31, 2018.   This nuance of black letter Bankruptcy law was not and indeed

did not need to be included in the text since it is basic to the practice.").)

    The Confirmed Plan does not appear to address explicitly the issue of whether the ESOP-

owned Equity Interests in the Debtor may be sold or otherwise transferred before January 1,

2019, to a party other than the Debtor.   Accordingly, in this Court's view, the Confirmed Plan is

either silent or ambiguous on this issue and, therefore, under Kentucky law, it is proper to

consider the circumstances surrounding the Confirmed Plan, as well as the subject matter of the

Plan, the objects to be accomplished, and the conduct of the parties, in addition to the Plan's

language.   See Cantrell Supply, 94 S.W.3d at 385; Janowick, 470 F.3d at 270–72; see also In re

Dow Corning, 456 F.3d at 677 ("disagree[ing] with the bankruptcy court's conclusion that the

plan was unambiguous," but holding that the bankruptcy court did not "incorrectly interpret[] its

own prior language or intent").[10]   Indeed, "if a contract is silent on a certain point, the law will

---

[10] As Kentucky law permits a court to consider "parol and extrinsic evidence involving the circumstances
surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the

imply an obligation to carry out the purpose for which the contract was made." <u>Old Republic Ins. Co. v. Ashley</u>, 722 S.W.2d 55, 58 (Ky. Ct. App. 1986) (citing <u>Warfield Nat. Gas Co. v. Allen</u>, 59 S.W.2d 534 (Ky. 1933)).   Here, the Bankruptcy Court clearly considered these factors, notwithstanding its failure to acknowledge what it was doing, when it relied on its understanding of the Chapter 11 case it presided over for nearly four years and the negotiations of the parties leading up to the Third Amended Plan in interpreting the Confirmed Plan.   The court "then exercised its equitable powers to breathe life into the provisions of the Plan," <u>In re Terex</u>, 984 F.2d at 172, holding that there could be no purchase by Delfasco of the Equity Interests in the Debtor before completion of the repayment terms of the Amended Plan, as the sale would cause Conco to be unable to continue as a going concern, given that its two largest customers would cease doing business with it, the Amended Plan to fail, and the unsecured creditors would to not get paid despite their negotiations and agreement to the Amended Plan. Appellants' argument that the parties could not have intended such a restriction because the Article V language regarding the treatment of Class 4 was included in prior plan drafts is unpersuasive.   The Debtor always proposed a plan where the ESOP would retain equity. "Rather, what is instructive is that the Debtor ultimately incentivized the Committee and the creditors to support the Plan because of the Defined and Contingent Distributions, which were enabled by the restriction on the transfer of the Equity Interests and the ongoing operation of the Debtor's business."   (Oversight Committee's Br. [App. DN 41] 26.)   Appellants' argument regarding the disclosure statement is likewise unpersuasive and fails to demonstrate that the Bankruptcy Court abused its discretion.

---

conduct of the parties" "[w]here a contract is ambiguous or silent on a vital matter," <u>Cantrell Supply</u>, 94 S.W.3d at 385, the Court need not determine whether the Plan is ambiguous or silent in order to decide this appeal.

Appellants are correct that the only party expressly prohibited from purchasing the ESOP-owned Equity Interests before January 1, 2019, is the Debtor. This is clear from the plain language of the treatment of the Class 4 Equity Security Interests in Article V of the Confirmed Plan. (See [Bankr. DN 468-1] 9.) However, the plan's language is not inconsistent with the Bankruptcy Court's interpretation precluding a sale of the ESOP-owned Equity Interests. While the Plan makes clear that the Debtor may not repurchase or contribute money to the ESOP for the Equity Interests before 2019, it makes no reference to whether the Equity Interests are permitted to be sold or otherwise transferred to a party other than the Debtor before 2019. Appellants contend that under rules of contract interpretation, such as *expressio unius*, the failure to address this issue equates unequivocally to no possible restriction existing. While this argument perhaps has some appeal, it fails to take into account other rules of contract interpretation, such as the contract must be read as a whole, see Cantrell Supply, 94 S.W.3d at 384–85, and fails to overcome the significant deference given to the Bankruptcy Court's interpretation, see In re Dow Corning, 456 F.3d at 676. Since the Confirmed Plan is either ambiguous or silent as to this issue, the Bankruptcy Court was reasonable in its reliance on the evidence expressly or impliedly relied upon in its opinion, and the Court gives significant deference to the Bankruptcy Court's decision, Appellants have not met "the extremely difficult burden of demonstrating on appeal that the bankruptcy court incorrectly interpreted its own prior language or intent." In re Dow Corning, 456 F.3d at 677; see In re Terex, 984 F.2d at 172; see also In re Settlement Facility Dow Corning Trust, 628 F.3d at 772 (deference due where "[t]here is simply no denying that [the lower court judge] is much more familiar with this Plan—and with the parties' expectations regarding it—than we are"). Accordingly, the Bankruptcy Court did

not abuse its discretion in interpreting the Confirmed Plan and enjoining the sale of the Equity Interests before January 1, 2019.

Appellants also argue that the Bankruptcy Court erred by applying the absolute priority rule under 11 U.S.C. § 1129(b) when the absolute priority rule is statutorily inapplicable to the Debtor's consensual Plan under 11 U.S.C. § 1129(a).   This argument fails on its premise.   As noted earlier, the Bankruptcy Court did not *apply* the absolute priority rule; the Bankruptcy Court referenced the rule to explain the context for the bargain reached between the parties when the Confirmation Order was entered without objection—although the Committee objected to the Debtor's first three proposed plans (see [Bankr. DN 184 & 236, 256 & 284, 340 & 368]), the Committee and the Debtor eventually negotiated a consensual plan where the absolute priority rule would not apply in exchange for the Defined Distributions and the Contingent Distributions. The Bankruptcy Court merely explained that the Committee and the unsecured creditors could have successfully prevented entry of the Confirmation Order under the absolute priority rule, but that they chose not to in exchange for the benefits provided under the Plan.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the February 18, 2016 decision of the Bankruptcy Court [Bankr. DN 552] is **AFFIRMED**.

**IT IS FURTHER ORDERED** that Appellants' motion to expedite the appeal [App. DN 4] is **DENIED as moot**.

*Joseph H. McGinley*

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

July 7, 2016

cc:     Counsel of Record
        Hon. Joan A. Lloyd
        United States Bankruptcy Court Clerk